# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 9 200

LUTHER D. THOMAS, Clerk

By: _J. Purcell_ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GWINDELYNE DENISE DOUGLAS, )
)
    Plaintiff, )    CIVIL ACTION
)
v. )    NO. 1:03-CV-2538-CC
)
FOUNDATION FUNDING GROUP, INC., )
and WASHINGTON MUTUAL BANK, FA, )
)
    Defendants. )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff moves, pursuant to Rule 56, Federal Rules of
Civil Procedure, for an order granting her a partial summary
judgment against Defendant Washington Mutual Bank, FA.
("Washington Mutual").[1]  As Plaintiff shows in Plaintiff's
Memorandum of Law in Support of Motion for Partial Summary
Judgment, filed contemporaneously herewith, she must prevail as a
matter of law in her claims under the Truth in Lending Act
("TILA") for rescission and for statutory damages with regard to
the transaction at bar.[2]

Relying on controlling authorities applied to facts upon
which there can be no genuine dispute (see Plaintiff's Statement

---

[1] The claims against the other Defendant have been dismissed.

[2] This Motion does not address Plaintiff's claim for actual
damages. That claim involves probable factual controversies and
thus is reserved for trial.



of Material Facts as to Which There Is No Genuine Issue to Be Tried, filed contemporaneously herewith), Plaintiff seeks an order of partial summary judgment determining (1) that the TILA rescission demands that Plaintiff made were timely and effective, and that, consequently, the entire transaction at bar has been rescinded under TILA and is no longer enforceable, and Washington Mutual is liable to the Plaintiff for costs and attorney's fees; and (2) that as the result of Washington Mutual's failure to respond properly to Plaintiff's rescission demands, Washington Mutual is liable to Plaintiff in the amount of $2,000 in TILA statutory damages, plus costs and attorney's fees.

WHEREFORE, Plaintiff moves for an order granting her a partial summary judgment as specified above.

## LOCAL RULE 7.1D CERTIFICATION

The undersigned certifies that this document was prepared in Courier New (12 point) font, one of the font and point selections approved by Local Rule 5.1B.

_____
Charles M. Baird
Georgia Bar No. 032500

Attorney at Law
235 Peachtree Street, Suite 400
Atlanta, Georgia 30303-1400
(404) 287-2383
Mobile:(404) 522-9485
Fax: (404) 627-7056                    Attorney for Plaintiff

-2-

CERTIFICATE OF SERVICE

I certify that on April 29, 2004, I served a copy of this document, by first class U.S. Mail with proper postage, upon counsel for Defendant Washington Mutual Bank, FA at the address shown below.[3]

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
Powell, Goldstein, Frazer &
Murphy LLP
Sixteenth Floor
191 Peachtree Street, N.E.
Atlanta, Georgia 30303

Charles M. Baird
_____
Charles M. Baird

---

[3] Plaintiff has dismissed her claims against Defendant Foundation Funding Group, Inc.

# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

APR 2 9 2004

LUTHER D. THOMAS, Clerk
By: _F. Hroku_ Deputy Clerk

GWINDELYNE DENISE DOUGLAS,       )
                                 )
      Plaintiff,                 )        CIVIL ACTION
                                 )
v.                               )        NO. 1:03-CV-2538-CC
                                 )
FOUNDATION FUNDING GROUP, INC.,  )
and WASHINGTON MUTUAL BANK, FA,  )
                                 )
      Defendants.                )

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff ("Ms. Douglas") seeks relief under the Truth in Lending Act, 15 U.S.C. §§ 1601-1666 ("TILA") and Regulation Z, 12 C.F.R. § 226, with regard to a home mortgage refinancing ("Transaction") that she entered into on August 31, 2000, with Defendant Foundation Funding Group, Inc.("FFG").[1] The Transaction was subsequently assigned to Bank United of Texas, FSB, which was merged into Defendant Washington Mutual Bank, FA ("Washington Mutual").

This Memorandum is in support of Plaintiff's Motion for Partial Summary Judgment ("Motion"), which is addressed to

---

[1]Ms. Douglas was unable to serve FFG, which has apparently dissolved its business, and therefore dismissed her claims against it, without prejudice, on January 5, 2004.

certain matters herein about which Ms. Douglas asserts there is no legitimate factual controversy. Ms. Douglas shows in argument below that, under controlling authorities applied to facts that cannot be genuinely disputed, she must prevail in her claims under TILA for rescission and for statutory damages with regard to the Transaction.[2]

The TILA claims addressed by Ms. Douglas's present Motion are, briefly, as follows:

(1) that she was not given proper disclosure under TILA of the schedule of payments or the total of payments in the Transaction.

(2) that she was not given a disclosure that met the requirements of 15 U.S.C. § 1639(a) and 12 C.F.R. § 226.32(c);

(3) that even if she was given such a disclosure, she did not receive it three business days in advance of the Transaction, as required by 15 U.S.C. § 1639(b)(1) and 12 C.F.R. § 226.31(c)(1);

(4) that she was not given a proper disclosure of her right to rescind the Transaction under TILA;

(5) that as a result of the foregoing violations of TILA,

_____

[2] The Motion does not address Ms. Douglas's claim for actual damages under TILA. This claim involves probable factual controversies and thus is reserved for trial.

she obtained an extended right to rescind the Transaction under
TILA, which she validly exercised;

(6) that even if the rescission period was not extended, she
nevertheless effectively rescinded the Transaction with a timely
rescission demand;

(7) that the immediate and automatic effect of her
rescission was to render the Transaction unenforceable;

(8) that by failing to meet the terms of her rescission
demand, Washington Mutual violated TILA and incurred liability
thereunder.

## II.   DEPOSITION TRANSCRIPT AND DECLARATIONS

A copy of the transcript of the Deposition of Gwindelyne
Denise Douglas is attached as Exhibit C to Washington Mutual
Bank's Brief in Support of Its Motion for Summary Judgment
("Washington Mutual's Summary Judgment Brief"). Copies of pages
of this transcript that are cited herein are attached hereto, in
numerical sequence, as Exhibit A. Concurrently with this
Memorandum, Ms. Douglas is filing the Declaration of Gwindelyne
Denise Douglas ("Douglas Declaration"), the Second Declaration of
Gwindelyne Denise Douglas ("Second Douglas Declaration"), and the
Declaration of Elaine Robertson ("Robertson Declaration").

## III. FACTUAL BACKGROUND

Ms. Douglas works for the Clayton County Sheriff's

-3-

Department in Jonesboro, Georgia. Previously, she served with the United States Army for twenty years. (Douglas Dep. at 6.) Her oldest child is in the United States Air Force and recently served in Iraq. (Second Douglas Decl. ¶ 2.)

In the summer of 2000, Ms. Douglas received an unsolicited telephone call from a person named Heather May ("Ms. May") at FFG, encouraging her to refinance her home mortgage with FFG.[3] Ms. May told Ms. Douglas that a refinancing with FFG would lower her mortgage payments. That sounded good to Ms. Douglas, who was recovering from serious surgery and had been unable to work full time. Therefore, Ms. Douglas agreed to refinance with FFG. (Douglas Dep. at 6:19-7:19; 40:21-41:12.)

Originally, the closing date of the Transaction was August 26, 2000. However, this date was changed to August 31, 2000, because Ms. Douglas's co-borrower, Noel Douglas ("Mr. Douglas"), was, out of town on August 26, 2000. (Douglas Dep. at 41:15-20; 43:11-15; 52:10-53:10; Sec. Douglas Decl. ¶¶ 4-7.) At the closing, Ms. Douglas, who had not previously received any documents concerning the Transaction, (Douglas Dep. at 61:24-62:20), noticed that the terms of the refinancing were not what Ms. May had represented to her, and in fact increased rather than

---

[3] FFG did business as GreatStone Mortgage. It has been reported that under this name, FFG, "now defunct," ran a "high pressure telemarketing operation." (See Ex. B.)

decreased her monthly mortgage payments. (Douglas Dep. at 44:3-12; 53:21-24; Second Douglas Decl. ¶ 2 .) Ms. Douglas interrupted the closing and attempted to telephone Ms. May about this, but could not reach her. (Douglas Dep. at 53:21-24; 54:6-17.) Eventually, Ms. Douglas went through with the closing, because she felt that she had no other choice and felt pressured to do so. (Douglas Dep. at 54:6-18; 55:6-7.)

As Ms. Douglas was signing the closing documents, she noticed that they were dated August 26, 2000, not August 31, 2000, the day of the closing. She asked the closing attorney whether this was a problem, and he assured her that this would be taken care of. (Douglas Dep. at 42:4-9; 53:25-55:8.) The closing attorney also told her to use the date August 26, 2000, when she entered a date next to her signature. She did so relying on his assurance that this was proper and that any problem with the dating would be taken care of. (Id.)

After the August 31, 2000 closing, Ms. Douglas was still upset about the increase in her monthly payments.[4] (Douglas Dep. at 44:3-12; Robertson Decl. ¶ 2.) She was also upset about errors in an important closing document. (Robertson Decl. ¶ 3.) The

_____

[4] The increase in payments occurred even though she had received no new funds and there were no payoffs to any of her creditors other than the prior mortgage company (see Douglas Dep., Ex.1 (docs. WM 0011, WM 0012)).

Notice of Right to Cancel was dated August 26, 2000. (Douglas
Dep. at 47:11-16.) This would make August 30, 2000, the day
before the closing, the last day to exercise her TILA rescission
right. A friend, Elaine Robertson, suggested that Ms. Douglas
return to the closing attorney's office and ask that the
incorrect date be changed. (Douglas Dep. at 47:11;  Robertson
Decl. ¶ 4.)

Within three business days of the August 31, 2000, closing,
Ms. Douglas returned to the closing attorneys's office with the
Notice of Right to Cancel, to get the date changed and to use the
Notice to cancel the Transaction. (Douglas Dep. at 47:18-48:1;
50:25-51:11; 64:1-66:9.) She was told, however, that she could
not cancel the Transaction without Mr. Douglas's signature.
(Douglas Dep. at 51:15-17.) This effectively meant to her that
she could not use her three-day rescission right, because Mr.
Douglas would not be back in town from a trip until more than
three business days from the closing. (Douglas Dep. at 51:14-21;
55:23-56:2.)

Ms. Douglas left the closing attorney's office in extreme
disappointment. She sat in her car and cried. (Douglas Dep. at
51:25-52:1.) Believing that there was nothing further that she
could do, Ms. Douglas resigned herself to paying the new, higher
payments imposed on her in the Transaction. Eventually, however,

she was able to find legal representation and seek redress
herein.

**IV.  GOVERNANCE OF TILA AND THE RESCISSION PROVISIONS THEREOF**

There is no dispute that the Transaction is subject to TILA.
Nor can it be genuinely disputed that

(1) as part of the Transaction, FFG acquired or
retained a security interest in Ms. Douglas's principal
dwelling, (Douglas Decl. ¶ 4); and

(2) the Transaction was not for acquisition or
initial construction of Ms. Douglas's dwelling, (id.).
Thus the Transaction falls under the rescission provisions of
TILA at 15 U.S.C. § 1635 and Regulation Z at 12 C.F.R. § 226.23.

**V.  APPLICABILITY OF THE SPECIAL PROVISIONS IN TILA ADDED BY THE
HOME OWNERSHIP AND EQUITY PROTECTION ACT**

It is undisputed that the total points and fees payable in
connection with the Transaction make it a mortgage of the type
referred to in 15 U.S.C. §1602(aa). (Am. Compl. ¶ 9; Washington
Mutual's Answer ¶ 9.) Thus the Transaction falls under the
special provisions that were added to TILA by the Home Ownership
and Equity Protection Act ("HOEPA"). See 15 U.S.C. § 1639. HOEPA
applies to mortgage loans with especially high costs, and is
designed to protect financially challenged homeowners who are
likely to have little leverage against overreaching mortgage

-7-

lenders who impose onerous terms.[5]

## VI.   TILA POLICY OF LIBERAL CONSTRUCTION IN FAVOR OF CONSUMERS AND STRICT COMPLIANCE BY CREDITORS

TILA is remedial legislation designed to eliminate impediments to the informed use of credit. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 363-65, 377 (1973). TILA "is intended to balance scales thought to be weighed in favor of lenders." Bizier v. Globe Fin. Servs., Inc., 654 F.2d 1, 3 (1st Cir. 1981). Accordingly, courts "liberally construe [TILA's] language in favor of the consumer." Rodash v. AIB Mortgage Co., 16 F.3d 1142, 1144 (11th Cir. 1994).

Creditors must strictly comply with TILA. Rodash, 16 F.3d at 1144. TILA disclosures must be made in "the proper technical form," and TILA remedies are triggered by "even minute deviations from requirements." Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1380 (11th Cir. 1984).[6] Nor do TILA claimants

---

[5] HOEPA "reveals congressional awareness that unscrupulous lending practices exist despite TILA provisions and necessitate further governmental oversight." United Cos. Lending Corp. v. Sargeant, 20 F. Supp. 2d 192, 203 n.6 (D. Mass. 1998).

[6] As a counterbalance to the requirement of strict compliance with TILA, the statute provides certain creditor defenses in 15 U.S.C. § 1640, such as the "bona fide error" defense at 15 U.S.C. §1640(c). The bona fide error defense is explicitly inapplicable, however, to errors of legal judgment. Additionally, the creditor has the burden of proving this defense in all of its elements. Furthermore, the defense can be used only against being "held liable" under TILA. The defense does not, therefore, apply to the

need to show that they have been harmed. Rodash, 16 F.3d at
1145. "An objective standard is used to determine violations of
the TILA, based on the representations contained in the relevant
disclosure documents; it is unnecessary to inquire as to the
subjective deception or misunderstanding of particular
consumers." Zamarippa v. Cy's Car Sales, 674 F.2d 877, 879 (11th
Cir. 1982).

With regard to TILA, a court does "not [have the]
prerogative to substitute its own view for that of Congress."
Thomka v. A.Z. Chevrolet, Inc., 619 F.2d 246, 250 (3d Cir. 1980).
Absent a statutory defense, exception, or tolerance, any
violation of TILA, no matter how technical, is actionable. As the
Former Fifth Circuit stated, in binding authority, "Congress did
not intend creditors to escape [TILA] liability where only
technical violations were involved." Pennino v. Morris Kirschman
& Co., 526 F.2d 367, 370 (5th Cir. 1976).[7]

_____

TILA right to rescind, the exercise of which does not impose
statutory  liability but instead restores the parties to the
status quo ante. See FDIC v. Hughes Dev. Co., 684 F. Supp. 616,
622 (D. Minn. 1988), aff'd on other grounds, 938 F.2d 889 (8th
Cir. 1991)(restoration to the status quo ante resulting from a
successful TILA rescission does not constitute a civil penalty,
in contrast to damages under 15 U.S.C. § 1640); see also 15
U.S.C. § 1640(a)(3)(distinction between "liability" and
rescission right); 15 U.S.C. § 1649(a)(same).

[7]Decisions of the former Fifth Circuit rendered prior to
October 1, 1981 are binding precedent in the Eleventh Circuit.

## VII.  IMPROPER DISCLOSURE OF THE PAYMENT SCHEDULE IN THE TRANSACTION

TILA requires accurate disclosure of the payment schedule in a credit transaction. 15 U.S.C. §1638(a)(6); 12 C.F.R. § 226.18(g). The TILA disclosure statement used in the Transaction shows a range of monthly payments, from $1064.19 to $1008.41. (See Ex. C.) This disclosure is inaccurate. The final payment in the range should be $1001.44, not $1008.41. This is shown by the full, unabbreviated "Payment Schedule" provided by Washington Mutual, which is attached hereto as Exhibit D. (See Washington Mutual Bank's Summ. J. Br., Ex. E.)

Washington Mutual may argue that the above inaccuracy is within some kind of tolerance. However, although TILA contains tolerances for the "annual percentage rate" and "finance charge" disclosures, there is no such tolerance for the payment schedule disclosure.

## VIII.  IMPROPER DISCLOSURE OF THE TOTAL OF PAYMENTS IN THE TRANSACTION

TILA requires accurate disclosure of the "total of payments" in a credit transaction. 15 U.S.C. §1638(a)(5); 12 C.F.R. § 226.18 (h). The TILA disclosure statement used in the Transaction shows a total of payments in the amount of

---

Bonner v. City of Prichard, 661 F. 2d 1206 (11th Cir. 1981).

$376,325.04. (See Ex. C.) However, this amount is inaccurate. The true total of payments is $376,317.47. (See Ex. D.) TILA provides no tolerance for inaccuracies with regard to this disclosure.

## IX.   FACIAL VIOLATIONS OF HOEPA ON THE SECTION 32 MORTGAGE LOAN DISCLOSURE GIVEN TO MS. DOUGLAS

HOEPA, at 15 U.S.C. § 1639 and 12 C.F.R. § 226.31-.32, requires that a consumer be given a special warning, with mandated content in a mandated format, three business days before the closing of a high-cost mortgage ("section 32 notice"). The Section 32 Mortgage Loan Disclosure ("Section 32 Disclosure") that Ms. Douglas was given in the Transaction is facially in violation of HOEPA. First, it does not disclose certain mandated information in the "conspicuous type size" required by HOEPA. (See 15 U.S.C. § 1639(a)(1); 12 C.F.R. § 226.32(c).) This conspicuousness requirement is in addition to the general requirement for all HOEPA disclosures that they be made "clearly and conspicuously." See 12 C.F.R. § 226.31(b)(1). Thus the Congressional intent is that the mandated disclosures on the section 32 notice should have a heightened conspicuousness.

The following "Notices" must be given in HOEPA transactions:

> You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have

> put into it, if you do not meet your
> obligations under the loan.

12 C.F.R. § 226.32(c)(1). TILA case law requires that a
"conspicuous" disclosure stand out and catch the consumer's
attention. See, e.g., Powers v. Sims & Levin Realtors, 396 F.
Supp. 12, 14-15 (E.D. Va. 1975), aff'd on other grounds, rev'd in
nonrelevant part, 542 F.2d 1216 (4th Cir. 1976). This requirement
cannot be met if the text of the disclosure in question is
typographically indistinguishable from nearby text. That is the
problem with the Section 32 Disclosure that was given to Ms.
Douglas: the size and format of the mandated text are identical
with that of other, non-mandated text, such as the paragraph
whose first sentence is "THERE ARE 2 DISCLOSURES FOR EACH
BORROWER." (See Douglas Dep., Ex. 1 (doc. WM 0020); Ex. E
hereto.)

Additionally, the mandated textual information about the
annual percentage rate and monthly payments (see 15 U.S.C. §
1639(a)(2); 12 C.F.R. § 226.32(c)(2)-(c)(3)) is even smaller than
the text above and below the borrowers' names, and the mandated
numerical disclosures are no larger than non-mandated numbers
such as the pre-printed dates for the signatures. Here, too, FFG

-12-

failed to satisfy the "conspicuous type size" requirement.[8]

The other facial violation on the Section 32 Disclosure is an inaccurate disclosure of the monthly payment amount. See 15 U.S.C § 1639(a)(2); 12 C.F.R. § 226.32(c)(3). The amount disclosed is $1005.82. (See Ex. E hereto.) This amount, however, is understated.

The monthly payment amount must include the mortgage insurance premium, because (a) a mortgage insurance premium must be disclosed as part of the TILA "finance charge" (see 12 C.F.R. § 226.4(b)(5)) and (b) the payment schedule "should reflect all components of the finance charge, not merely the portion attributable to interest" (FRB Commentary on 12 C.F.R. §

---

[8] Ms. Douglas properly seeks summary adjudication of the "conspicuousness" issue. The question of whether a TILA disclosure is "clear and conspicuous" is a matter of law, not fact. For example, in Herrera v. Northern Sav. & Loan Ass'n, 805 F.2d 896, 900 (10th Cir. 1986), the Tenth Circuit specifically rejects the creditor's argument that "reasonable minds could differ" as to the conspicuousness of a TILA disclosure, precluding summary judgment. Notably, the Herrera holding relies upon the Eleventh Circuit's decision in Shroder, wherein the court held that the consumer was entitled to judgment "as a matter of law" with regard to the conspicuousness issue. See 729 F.2d at 1371, 1379, 1382.

Similarly, in Rodash, a case dealing with disclosure of the consumer's TILA rescission rights, the Eleventh Circuit found the question of "clear and conspicuous" disclosure (see 16 F. 3d at 1144, 1146, 1147) to be a matter of law (see 16 F. 3d at 1143, 1146, 1147), and reversed the district court's denial of the consumer's motion for summary judgment on this issue (see 16 F. 3d at 1149).

-13-

226.18(g), General Comment 1, <u>reprinted in</u> 12 C.F.R. pt. 226,
Supp. I (emphasis added)). In fact, the FRB specifically states
that the "payment schedule should reflect the consumer's mortgage
insurance payments." FRB Commentary on 12 C.F.R. § 226.18(g),
General Comment 5, <u>reprinted in</u> 12 C.F.R. pt. 226, Supp. I.

The monthly payment disclosure on the Section 32 Disclosure
given to Ms. Douglas should have contained the actual monthly
payment, including the mortgage insurance premium, for all
payment levels (i.e., all series of monthly payments of the same
amount). The FRB is very straightforward about this requirement:
"If the loan has more than one payment level, the regular payment
for <u>each</u> level <u>must</u> be disclosed." FRB Commentary on 12 C.F.R. §
226.32(c), Comment 1.i on Paragraph 32(c)(3), <u>reprinted in</u> 12
C.F.R. pt. 226, Supp. I (emphasis added).

However, since there are thirty-one payment levels in the
Transaction, (<u>see</u> Ex. D), FFG could have chosen to "rely on the
rules set forth in [the FRB Commentary on 12 C.F.R.] §
226.18(g)." FRB Commentary on 12 C.F.R. § 226.32(c), Comment 1 on
Paragraph 32(c)(3), <u>reprinted in</u> 12 C.F.R. pt. 226, Supp. I
(emphasis added). One of those rules allows disclosure of an
abbreviated range of payments where a number of different payment
amounts result from a continual decrease in the amount of a
monthly insurance premium that is part of the monthly payment.

-14-

(See FRB Commentary on 12 C.F.R. § 226.18(g), Comment 1 on Paragraph 18(g)(2), reprinted in 12 C.F.R. pt. 226, Supp. I).

FFG violated HOEPA by disclosing neither the actual monthly payment for all payment levels in the Transaction nor a range of actual payments. Instead, the Section 32 Disclosure shows only one monthly payment figure, $1005.82, which includes principal and interest only, (see Ex. D). In making such a disclosure, FFG understated the actual initial payment in the Transaction, $1064.19, (see Ex. D), by $58.37 ($1064.19 -1005.82 = $58.37).[9]

**X.   THE CONSUMER'S RIGHT TO REBUT A WRITTEN ACKNOWLEDGMENT OF RECEIPT OF A DOCUMENT IN A TRANSACTION SUBJECT TO THE TILA RESCISSION PROVISIONS**

In a transaction governed by the TILA rescission provisions, a consumer's acknowledgment of receipt of required disclosures "does no more than create a rebuttable presumption of delivery" of those disclosures. 15 U.S.C. § 1635(c). In overcoming this presumption, the consumer faces a "low burden." Cooper v. First

_____

[9] Furthermore, by not disclosing at least an abbreviated range of actual monthly payments including the mortgage insurance premium, FFG implied that the regular monthly payment would never be increased to include a mortgage insurance premium. In so doing, FFG hid $14,222.27 in total insurance premiums over the life of the loan. This hidden amount is the difference between the $376,317.47 actual total of payments including the mortgage insurance payments, (see Ex. D), and the $362,095.20 total of payments assuming 360 monthly payments in the $1005.82 amount shown on the Section 32 Disclosure. ($376,317.47 - 362,095.20 = $14,222.27.)

-15-

<u>Gov't Mortgage & Investors Corp.</u>, 238 F. Supp. 2d 50, 65 (D.D.C. 2002). The consumer can, in fact, obtain a summary adjudication of non-delivery of documents when the creditor offers no evidence of delivery beyond an acknowledgment of receipt. <u>See, e.g.</u>, <u>Stone v. Mehlberg</u>, 728 F. Supp. 1341, 1354 (W.D. Mich. 1990).

## XI.  FAILURE TO PROVIDE MS. DOUGLAS WITH A SECTION 32 NOTICE AT LEAST THREE DAYS PRIOR TO THE CLOSING OF THE TRANSACTION.

FFG further violated HOEPA by failing to provide Ms. Douglas with a section 32 notice, which must be given three business days in advance of closing, until the day that the Transaction closed.[10] It is important to note that the Section 32 Disclosure that Ms. Douglas received in connection with the Transaction is designed to be mailed out to the consumer and then returned by mail in the "attached envelope." (<u>See</u> Ex. E.) Thus the document,

_____

[10] The present case affords a good example of why an advance section 32 notice should be given in a high-cost HOEPA loan. What FFG did to Ms. Douglas was, inter alia, to include a $1407 "Loan Origination Fee" and a $10,033.54 "Loan Discount" in the Transaction that far exceeded any services or other benefit provided and also increased the principal amount of the loan to the extent that Ms. Douglas's payments increased above the monthly payment on her prior loan-- even though the Transaction did not provide any funds or pay off any of her debts. (<u>See</u> Douglas Dep., Ex. 1 (doc. WM0012).) If Ms. Douglas had received advance warning that her monthly payments would be increasing as a result of the Transaction, she would never gone to the closing. Reducing her payments was the primary reason that she wanted to refinance her prior mortgage. (<u>See</u> Douglas Dep. at 62:1-9; Second Douglas Decl. ¶ 9.)

if it is used as designed, should never have a pre-printed date next to a signature line. How could FFG (or the closing attorney) know in advance, when mailing the document out to the consumer, what day the consumer would sign it and mail it back?

That the Section 32 disclosure given to Ms. Douglas did have a pre-printed date is significant. This indicates that the document was prepared, like all of the other documents, including the loan application and the good faith estimate, to be given to Ms. Douglas and to be signed by her no sooner than the day of closing.[11] A further indication of this is the lack of a signature on the line at the bottom of the document to certify that it was "mailed 5 or more business days prior to the loan closing." (See Ex. E.)

All of the above bolsters Ms. Douglas's clear recollection that she did not receive any documents prior to the closing of the Transaction, (see Douglas Dep. at 61:24-62:20), which means that she did not sign the Section 32 Disclosure until the closing. Thus the evidence is certainly strong enough to rebut

---

[11] It is clear that FFG and the closing attorney made no distinction in the Transaction between pre-closing documents and closing documents. These documents were prepared together and were presented together at the closing. Significantly, Washington Mutual has produced no document even nominally signed before the day that Washington Mutual says the closing of the Transaction took place. This supports Ms. Douglas's testimony that she received no documents prior to closing (see Douglas Dep. at 61:24-62:20).

-17-

(see section X of this Memorandum, above[12]) the acknowledgment of receipt on the Section 32 Disclosure, "I have received this disclosure at least 3 business days prior to my loan closing," (see Ex. E). This is especially so, given the ungrammaticality of the acknowledgment in the context in which it was signed.[13]

## XII. FAILURE TO PROVIDE MS. DOUGLAS WITH A CLEAR DISCLOSURE OF HER TILA RIGHT OF RESCISSION

Washington Mutual agrees with Ms. Douglas that all of the loan documents were signed on the day that the Transaction closed.[14] The dispute is as to the date of the closing. Whatever the date of closing, however, the document entitled "Certificate (That Customer Does Not Rescind Transaction)" ("Certificate")(see Douglas Dep., Ex. 3; Ex. F hereto) violated TILA by rendering the

---

[12] The consumer's right to rebut an acknowledgment of receipt under 15 U.S.C. § 1635(c) includes rebuttal of an acknowledgment of receipt of a section 32 notice. Bryant v. Mortgage Capital Resource Group, 197 F. Supp. 2d 1357, 1363 (N.D. Ga. 2002).

[13] The acknowledgment of receipt is ungrammatical in the context of being signed on the day of closing, because the aspect of the verb is wrong: it should be "received," not "have received." The former usage conveys the action of receiving as a discrete event in the past (e.g., three business days prior); the latter usage is appropriate only for a recent receipt considered to have occurred in a span of time including the time of the acknowledgment. (The requirement of proper verb aspect can be illustrated by the unacceptability of the sentence, "I have arrived yesterday.")

[14] See, e.g., Washington Mutual's Summ. J. Br. at 6 ("Each of the documents in the Plaintiff's Loan File were all signed by the Plaintiff on August 26, 2000").

disclosure of Ms. Douglas's TILA rescission right unclear.

The Certificate precludes rescission before the three-day period of the absolute rescission right under TILA, see 12 C.F.R. § 226.23(a)(3), even gets started. The Certificate states that, as of the day of its signing, the undersigned certify that they "will not rescind" the Transaction. (See Ex. F.) Furthermore, signature is mandatory: "EACH Customer must sign."(Id.)

These facts fall squarely under the Eleventh Circuit's decision in Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11ᵗʰ Cir. 1994). In Rodash, the consumer was presented at closing with a proper Notice of Right to Cancel. However, together with that document, the consumer was given a document captioned "Election Not to Cancel." The latter document contained the following pre-printed language: "Furthermore, the undersigned hereby acknowledges and affirms that each of us have elected not to cancel the transaction." 16 F.3d at 1145. The court held that the Election Not to Cancel "without question . . . precluded clear and conspicuous disclosure" of the consumer's absolute right under TILA to rescind the transaction within three business days from consummation of the transaction. 16 F.3d at 1146. Hence the TILA rescission right was not properly disclosed, and TILA was

-19-

violated.[15]

## XIII. FAILURE TO PROVIDE MS. DOUGLAS WITH AN ACCURATE DISCLOSURE OF THE DATE UPON WHICH THE ABSOLUTE RIGHT TO RESCIND UNDER TILA WOULD EXPIRE

The closing date in the Transaction was originally August 26, 2000, but was changed to August 31, 2000. This date change is confirmed by contemporaneous entries on a calendar maintained by Ms. Douglas. (See Douglas Dep. at 52:10-25.; Second Douglas Decl. ¶ 5.) It is further confirmed by a trip record showing that Ms. Douglas's co-signer, Mr. Douglas, was out of town on August 26, 2000, and thus unavailable for the closing on that date.[16] This evidence is sufficient to rebut any contrary presumption created by Ms. Douglas's signature on an acknowledgment of receipt. (See section X of this Memorandum, above.)

When the closing date was changed, FFG did not make corresponding changes in the Notice of Right to Cancel. Thus the Notice of Right to Cancel erroneously stated that the three-day

---

[15] Rodash was recently followed in Pulphus v. Sullivan, No. 02 C 5794, 2003 U.S. Dist. LEXIS 7080 (N.D. Ill. Apr. 25, 2003). Pulphus is even closer to the facts herein, in that there was a confirmation of election not to rescind that was dated three days after the closing, but the borrower alleged that it was signed on the day of closing. See 2003 U.S. Dist. LEXIS at *44.

[16] The trip record is attached to the Second Douglas Declaration as Exhibit B, and hereto as Exhibit G. It shows that on August 26, 2000, Mr. Douglas drove a truck for his employer to Memphis, Tennessee.

period for exercise of the TILA rescission right expired on August 30, 2000, the <u>day before the closing</u>. This clearly was an improper TILA disclosure. <u>See</u> 12 C.F.R. § 226.23(b)(1); <u>Jackson v. Grant</u>, 890 F.2d 118, 120-22 (9th Cir. 1989); <u>Staley v. Americorp. Credit Corp.</u>, 164 F. Supp. 2d 578, 583 (D. Md. 2001).

## XIV. MS. DOUGLAS'S EXTENDED RIGHT TO RESCIND, WHICH MADE HER AUGUST, 2003 RESCISSION TIMELY

Regulation Z at 12 C.F.R. § 226.23(a)(3) gives the consumer an <u>absolute, unqualified right to rescind</u> a non-purchase-money home mortgage under TILA "until midnight of the third business day following consummation, <u>delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last</u>" (emphasis added; footnote omitted). The "notice required by paragraph (b) of this section" is the notice of the right to rescind, whose contents are prescribed by 12 C.F.R. § 226.23(b).

As has been shown above, in the Transaction TILA was violated in a number of ways. Each of these violations involved either a material disclosure[17] or the requirement that the TILA

---

[17] The material disclosures are enumerated in Regulation Z at 12 C.F.R. § 226.23(a)(3) n.48. They include the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations required by HOEPA. An error as to any one of these disclosures (if it is not excused by a tolerance) extends the TILA rescission period. <u>Steele v. Ford Motor Credit Co.</u>, 783 F.

rescission right be accurately and clearly disclosed. Each one of these TILA violations independently expanded the TILA rescission period for the Transaction to three years. 15 U.S.C. § 1635(f); Rodash, 16 F. 3ᵈ at 1145. Accordingly, since the closing date of the Transaction was August 31, 2000, Ms. Douglas's right to rescind the Transaction under TILA had not yet expired when, on August 25, 2003, she had her counsel mail rescission demands to Washington Mutual.[18] Thus Ms. Douglas rescinded the Transaction in a timely manner.

## XV.  MS. DOUGLAS'S RESCISSION OF THE TRANSACTION WITHIN THREE BUSINESS DAYS OF THE CLOSING

Even if Ms. Douglas did not have an extended right of rescission, she validly rescinded the Transaction within three business days of the closing. During that period, she took the Notice of Right to Cancel to the closing attorney's office and presented it. The Notice of Right to Cancel is designed to be used as a written rescission demand: it has the statement "I wish to cancel" above a signature line. (See Douglas Dep., Ex. 4.)

Ms Douglas asked that the expiration date on the Notice of Right to Cancel be corrected to show that the rescission period

---

2d 1016 (11ᵗʰ Cir. 1986).

[18] Copies of these demands are attached as Exhibits C and D to the Douglas Declaration. Their receipt is not disputed.

had not expired, so that she could use the document as a
rescission demand. In response she was told that she could not
rescind without the participation of Mr. Douglas (who was out of
town and unavailable for the remainder of the rescission period).
(Douglas Dep. at 50:25-52:11.) This was a flatly erroneous
statement of the law. Ms. Douglas clearly had the right to
rescind the Transaction on her own.[19]

Ms. Douglas did all that she could do to rescind the
Transaction within three business days following the closing. The
fact that the closing attorney's office wrongfully refused to
accept the rescission document that she presented does not make
her rescission invalid.

## XVI.  THE AUTOMATIC EFFECT OF MS. DOUGLAS'S RESCISSION

It has been shown above that Ms. Douglas's rescission
demands were timely. Additionally, the demands were properly
directed and met the governing formal requirements of Regulation
Z at 12 C.F.R. § 226.23(a)(2), which are minimal.  Thus the

---

[19] TILA Regulation Z states that "[w]hen more than one
consumer in a transaction has the right to rescind, the exercise
of the right by one consumer shall be effective as to all
consumers."  12 C.F.R. § 226.23(a)(4). The Federal Reserve Board
has also specifically stated in its official commentary on
Regulation Z that "if both husband and wife have the right to
rescind a transaction, either spouse acting alone may exercise
the right and both are bound by the rescission." FRB Commentary
on 12 C.F.R. § 226.23(a)(4), reprinted in 12 C.F.R. pt. 226,
Supp. I (emphasis added).

demands were effective upon mailing. Id.  The mailing of the
demands was sufficient in itself to accomplish the rescission,
and immediately and automatically rendered the Transaction void.
Williams v. Homestake Mortgage Co., 968 F. 2d 1137, 1139, 1140
(11ᵗʰ Cir. 1992)(upon delivery of a rescission demand the
"agreement is ... automatically rescinded")(emphasis added).

For establishing that she properly rescinded the
Transaction, Ms. Douglas is entitled, in addition to rescission
of the Transaction, to attorney's fees and costs. See 15 U.S.C. §
1640(a)(3).

## XVII. WASHINGTON MUTUAL'S LIABILITY UNDER TILA FOR $2,000 IN STATUTORY DAMAGES FOR FAILURE TO MEET MS. DOUGLAS'S RESCISSION DEMANDS

As assignee of a HOEPA transaction, Washington Mutual has
full liability (except for limits not relevant herein) for claims
against FFG. See 15 U.S.C. § 1641(d). This liability is in
addition to the general assignee liability provision at 15 U.S.C.
§ 1641(a), (c). Washington Mutual also directly incurred $2,000
in statutory damages (apart from any actual damages, which are
not at issue in the present Motion) with regard to Ms. Douglas's
rescission demands. After receipt of a timely and effective TILA
rescission demand, the recipient must make the statutorily
prescribed response within twenty days. 15 U.S.C. § 1635(b).
Washington Mutual received Ms. Douglas's rescission demands and

-24-

failed to meet their terms within twenty days of receipt. Such failure caused Washington Mutual to incur liability for $2,000 in statutory damages, plus costs and attorney's fees. 15 U.S.C. §§ 1640(a)(2)(A), 1640(a)(3); <u>Gerasta v. Hibernia Nat'l Bank</u>, 575 F. 2d 580 (5th Cir. 1978)(applying former $1,000 maximum penalty per violation).[20] <u>Accord, e.g.</u>, <u>Williams v. Gelt Fin. Corp. (In re Williams)</u>, 232 B.R. 629 (Bankr. E.D. Pa. 1999), <u>aff'd</u>, 1999 U.S. Dist. LEXIS 12512 (E.D. Pa. 1999).

**CONCLUSION**

Under the above argument and authorities, Ms. Douglas is entitled as a matter of law to a partial summary judgment declaring that the Transaction has been validly rescinded and awarding her $2000 in TILA statutory damages, plus costs and attorney's fees.

<u>LOCAL RULE 7.1D CERTIFICATION</u>

The undersigned certifies that this document was prepared in Courier New (12 point) font, one of the font and point selections approved by Local Rule 5.1B.

(Signature follows.)

---

[20] <u>See</u> <u>supra</u> note 7.

Respectfully submitted,

*Charles M. Baird*

Charles M. Baird
Georgia Bar No. 032500

Attorney at Law
235 Peachtree Street, Suite 400
Atlanta, Georgia 30303-1400
(404) 287-2383
Mobile:(404) 522-9485
Fax: (404) 627-7056          Attorney for Plaintiff

-26-

# EXHIBIT A

6

1    Q    And how long have you lived there?

2    A    About five years.  Since '97.

3    Q    Are you currently employed?

4    A    Yes, ma'am.

5    Q    And what do you do for a living?

6    A    I work for Clayton County Sheriff's

7 Department.  I'm a sheriff's service clerk.

8    Q    How long have you done that?

9    A    This is my third year.  It will be four

10 years in October.

11    Q    Okay.  And is this the first house you've

12 owned?

13    A    No, ma'am.  While I was in the military, I

14 got a house in St. Louis.

15    Q    When were you in the military?

16    A    I did 20 years.  I entered March of '78.

17    Q    What branch of the service?

18    A    Army.

19    Q    So let's go back to 2000, and if you could

20 tell me how you first came into contact with

21 Foundation Funding Group.

22    A    It was -- her name was Heather May.  It was,

23 like, midsummer, late summer.  You know how they do

24 those -- what do you call them? -- those sales calls.

25 She called me on the phone, you know, and introduced

7

1  herself and the company about mortgaging.

2      Q    That was in late summer or fall?

3      A    Yeah.  Midsummer or summer.

4      Q    Okay.  Then did you have a chance to go meet

5  with her?

6      A    No, ma'am.

7      Q    You spoke to her on the phone, though?

8      A    Yes, ma'am.

9      Q    And at some point, you decided to get a

10 mortgage?

11     A    Yes, ma'am.

12     Q    So tell me how that came about.

13     A    She told me about what they could offer.

14 And at the time, I was going through surgery because I

15 had tumors, and what she was offering, it sounded real

16 good.  And she said that she could lower my mortgage,

17 you know, anywhere from like 50 to $75.  And then from

18 that -- and she said that she could get me qualified.

19 So then I went, you know, with her.

20     Q    Did she send you an application through the

21 mail?

22     A    No, ma'am.

23     Q    When did you first get your mortgage

24 application that you filled out?

25     A    When I went to closing.

LYON  REPORTING,  INC.

40

1       A     Yes, ma'am.

2       Q     And on the second page, Bates labeled

3   WM 0118, is that your signature, ma'am?

4       A     Yes, ma'am.

5       Q     And is that next to the date August 26,

6   2000?

7       A     Yes, ma'am.

8       Q     And is that your ex-husband's signature next

9   to the date August 26, 2000?

10      A     Yes, ma'am.

11            MS. DEMPSEY:  Okay.  I want to mark

12      this, please, as Exhibit 2.

13                  (Exhibit No. 2 was marked.)

14  BY MS. DEMPSEY:

15      Q     And these are a copy of the interrogatories

16  that your counsel filed in this matter.  And I want to

17  ask you a few questions about those in a minute, but I

18  want to go back to when you entered into this

19  mortgage.

20      A     Yes, ma'am.

21      Q     Ms. May called you on the phone and talked

22  to you about it; is that correct?

23      A     Yes, ma'am.

24      Q     Tell me the steps that occurred after that.

25      A     Basically, we talked and she said she could

41

1   help me, because, at the time, I was about to have

2   surgery.  So she gained my confidence by -- she prayed

3   with me on the phone and she told me that she had

4   someone that was going through cancer recovery

5   herself.

6           And then she told me about how she could

7   save me money, you know, on the mortgage that I was

8   paying, because I was paying 104.  And she told me she

9   would be able to save me money on a mortgage.

10          So I gave her some information, and then she

11  called me back and said that, you know, we will be

12  able to help you, and then we went from that.

13      Q    And then you scheduled a time to come in and

14  look at the documents; is that correct?

15      A    No.  What we did was she scheduled a time

16  for me to sign.  But the date that she gave me, Noel

17  was going to be on the road, so we rescheduled.

18      Q    So the date that you signed these documents,

19  what date was that?

20      A    The 31st of August.

21      Q    Now, when we're going through this, they're

22  all dated August 26, 2000; is that correct?

23      A    Yes, ma'am.

24      Q    Even the ones that you've signed yourself

25  and dated, those are all also dated August 26, 2000 --

42

1     A     Yes, ma'am.

2     Q     -- is that correct?

3     A     Yes, ma'am.

4     Q     But you understand that it was not August

5  26, 2000, that you signed these documents; is that

6  right?

7     A     Yes, ma'am.  I asked the guy that was -- the

8  lawyer that was sitting there (indicating) about the

9  date and he told everything was fine.

10     Q     When you signed it next to the -- when

11  you -- you did sign it in handwriting --

12     A     Yes, ma'am.

13     Q     -- next to your name, August 26, 2000 --

14     A     Yes, ma'am.

15     Q     -- and so did Mr. Douglas; is that right?

16     A     Yes, ma'am.

17     Q     Okay.  And you signed all the documents that

18  day sitting in Ms. May's office; is that where --

19     A     No.  We were -- it was in Georgia.  I talked

20  to her over the phone.  It was, I think, Douglasville

21  or Fairburn.  I'm not sure which is the city and which

22  is --

23          MR. BAIRD:  When you say "that day,"

24     what day are you referring to?

25  BY MS. DEMPSEY:

43

1      Q     Ms. May -- did you ever meet Ms. May?

2      A     No.

3      Q     So when you went in to sign the documents,

4  you were in the office of Johns & Johns; is that

5  correct?

6      A     Yes, ma'am.

7            MR. BAIRD:  When you say "that day" in

8         your question, which day are you referring

9         to?

10           THE WITNESS:  You said the 31st; right?

11           MS. DEMPSEY:  I said the day she signed

12        the documents.  The day she signed the

13        documents, where were you.

14           MR. BAIRD:  Okay.

15           THE WITNESS:  That was on the 31st and

16        we was at an office in -- I think it's either

17        Douglas or Fairburn.  I'm not sure which one

18        is the city and the county.  But we were in

19        that office in a back room.

20  BY MS. DEMPSEY:

21     Q     Of Johns & Johns?

22     A     Right.  I've never met Ms. May.

23     Q     Now, after you left the office of

24  Johns & Johns on the day you signed those documents --

25     A     Yes, ma'am.

44

1    Q    -- can you tell me what happened in relation
2    to this loan after that.
3    A    I was really upset, because it was --
4    nothing -- nothing happened the way Ms. May told me it
5    was going to happen.  And I had even tried to get
6    ahold of her before we finished signing the paperwork
7    and I never could.
8    Q    When you say nothing happened the way
9    Ms. May said it would, what do you mean?
10    A    What the mortgage would be, what the terms
11    of the contract was going to be about my mortgage
12    going down.  I was just really upset.
13    Q    Can you look at Exhibit 2 that I've handed
14    to you there.
15    A    Yes, ma'am.
16    Q    And if you could go to page 5 of that
17    document, that talks about any correspondence you've
18    had with my client, who is Washington Mutual Bank.
19    A    Yes, ma'am.
20    Q    Can you tell me about any correspondence
21    you've had with them.
22    A    You mean when I was signing the loan or
23    later?
24    Q    At any time.
25    A    Once they took over the loan, the only

47

1      A    No, because it was, like, in the beginning.

2  It was just, like, a little piece of paper from work.

3      Q    Now, what about conversations with the

4  people at Johns & Johns?  Can you tell me about any of

5  those that you've had?

6      A    No conversation other than the day we signed

7  and then when I went back to try to cancel the loan.

8      Q    Now, tell me about that, when you talk about

9  when you went back to cancel the loan.  Tell me about

10  that.

11     A    I had talked to my girlfriend and she had

12  told me that, you know, you have three working days to

13  cancel.  But when I looked at the form to send it in,

14  it had the 26th on it, and that was, like, you know,

15  way past.  So I figured, like, you know, I can't

16  cancel.

17          She was, like, no.  Three working days.

18          So what I did was -- she told me instead of

19  signing it and sending it in, because it's going to

20  have the wrong date, you need to take it to them so

21  they could change the date and then you sign it and

22  let them know you want to cancel the loan because this

23  is not what Ms. May promised you, this is not what you

24  wanted.

25     Q    Okay.  And did you do that?

LYON  REPORTING,  INC.

48

 1      A     Yes, ma'am.

 2            MS. DEMPSEY:   Could you please mark this

 3      as Exhibit 3.

 4            (Exhibit No. 3 was marked.)

 5   BY MS. DEMPSEY:

 6      Q     And this is a document that's Bates labeled

 7   at the bottom GD 0020.  And I submit to you this is

 8   one of the documents you've produced to me from your

 9   file.

10      A     Yes, ma'am.

11      Q     And that is a certificate that the customer

12   does not rescind transaction; is that correct?

13      A     Yes, ma'am.

14      Q     And is that your signature on it?

15      A     Yes, ma'am.

16      Q     And is that next to the date August 31st,

17   2000?

18      A     Yes, ma'am.

19      Q     And does that appear to be -- something to

20   have been crossed out there and then 31st written in?

21      A     Yes, ma'am.

22      Q     Under your name, does it say Noel --

23   Mr. Douglas, your ex-husband?

24      A     Yes, ma'am.

25      Q     And next to his name, is that dated

50

1              (Off-the-record discussion.)

2              THE WITNESS:  I saw it.

3  BY MS. DEMPSEY:

4      Q    You're looking for a document called notice

5  of right to cancel?

6      A    Yes, ma'am.

7      Q    And that's what you pulled from yours?

8      A    That's what I went back up there with.

9              MS. DEMPSEY:  And if you'll hold on just

10     a second.  If you could please mark that as

11     Exhibit 4.

12              (Exhibit No. 4 was marked.)

13  BY MS. DEMPSEY:

14     Q    And Exhibit 4 is Bates labeled GD 0030; is

15  that correct?

16     A    Yes, ma'am.

17     Q    And I submit to you that this was produced

18  to me from your attorney as well from your files.

19     A    Yes, ma'am.

20     Q    And that states at the top "notice of right

21  to cancel"?

22     A    Yes, ma'am.

23     Q    Is this the document you were talking about?

24     A    Yes, ma'am.

25     Q    So tell me what happened with that when you

51

1   went back to Johns & Johns.

2       A    When I went up to the office, I told the

3   lady who I was.  And the young lady that met me, you

4   know, her -- at her desk, she had black hair

5   (indicating).  And I told her that the contract is not

6   what I wanted, you know, and I understand I have the

7   right -- I can cancel it, you know, within that time.

8   But I told her the date was wrong, you know, and if

9   she could change the date so it would reflect the date

10  that I signed it to show that I did cancel it within

11  that time frame.

12          And then she told me that -- she said, well,

13  where's Mr. Douglas?

14          I said, well, he's on the road.

15          She said, well, ma'am, you can't cancel

16  without his signature because he signed the contract

17  with you, so you both have to cancel.

18      Q    Okay.  So what did you do at that point?

19      A    Well, I started to cry a little bit.  I told

20  her, I said, well, if I wait for him to come back, the

21  time will be over with.  I said, well, since I came up

22  here to you, you know, can I mail it in?

23          And she was, like, it has to be within that

24  time.

25          So I walked out of the office and I went and

52

1    sat in my car and cried.  Then I went home.

2            MS. DEMPSEY:  Let me mark this as

3        Exhibit 5.

4                (Exhibit No. 5 was marked.)

5    BY MS. DEMPSEY:

6        Q    And Exhibit 5 is Bates labeled GD 0002 and

7    GD 0003.  And this was a document produced to me by

8    your counsel from your files.

9        A    Yes, ma'am.

10       Q    Is this the document that makes you -- is

11   this from your calendar?

12       A    Yes, ma'am.

13       Q    And on the 30th of August, it says there,

14   Noel on the road, change to the 31st at 1:00 p.m.

15       A    Yes, ma'am.

16       Q    Do you have anything -- is that what makes

17   you think it was changed to the 31st?

18       A    No, ma'am.  It was like -- you know, I'd

19   write little notes, and you'll see where, like, on the

20   26th that we had the appointment, because I was, like,

21   you know, thank God everything was going to go.  But

22   then when Noel gets his trip reports and it tells him

23   when he has to be on the road, and then I told them, I

24   said, well, you know, we can't come because Noel was

25   going to be on the road.

1          So then they said, well, what's the next
2   good date?
3          And evidently it was the 31st.
4      Q    What was Noel's job?
5      A    He's a truck driver.  He worked for
6   Primetime.
7      Q    Do you have anything else that makes you
8   think --
9      A    His trip ticket.
10     Q    These (indicating).
11         Did you have any correspondence or anything
12  that talked about the 31st?
13     A    What do you mean?
14     Q    Any correspondence from Greatstone Mortgage
15  or from Foundation Funding Group or Johns & Johns?
16     A    The only dealing I had with them was I did
17  the contract on that day.  And after that, the only
18  second time I had to deal with them was when I tried
19  to cancel it.
20         Foundation, never talked to them after --
21  because I tried to get ahold of Heather at the signing
22  when I saw the numbers and how they was so high and
23  everything, because there was no way I could afford
24  that.  And I never talked to her after that day.
25     Q    So you saw the numbers before you started

54

1  signing the contract?

2      A    That's what made me question it, because it

3  wasn't what we had agreed to.

4      Q    But you still went through and signed the

5  contract?

6      A    Because at the time, I felt like I had no

7  choice, because I tried to get ahold of her.  And he

8  waited a little bit for her to try to call us back,

9  but then the lawyer was like, well, you know, I've got

10 other things I've got to do, other things I've got to

11 sign, and if you're going to take this contract -- and

12 then, you know, we're sitting there -- well, we were

13 already three months behind.  Because they took so

14 long to put everything together, they made me three

15 months behind in my other mortgage.  So I just -- I

16 felt pressured.

17     Q    So you went ahead and signed them?

18     A    Because I felt like I had no other choice.

19     Q    Did you -- when you were going through it

20 and signing it and it said August 26, 2000, did

21 that --

22     A    I brought that up, and he told me, he said,

23 don't worry about that, we'll fix that.  And so....

24     Q    But you did handwrite August 26, 2000, on a

25 number of these, didn't you?

55

1    A    Yeah, because he told me -- because I was
2  going to write the 31st and he said no, you know, just
3  write the 26th, because you'll notice it's only on a
4  couple of them.

5         And I thought it was strange at the time and
6  so did Noel, but, I mean, you know, you do the wrong
7  thing when you're pressured, I guess, or you trust the
8  wrong people.

9    Q    Did you -- if you'd look back at that one
10  there (indicating), not the calendar, the one below
11  it.  What's that exhibit number there?

12    A    Two.

13    Q    Okay.  If you'd look back at Exhibit 2,
14  please.  Do you have anything in writing that you gave
15  Johns & Johns saying that you wished to get out of
16  this loan?

17    A    Other than walking in there with the
18  cancellation papers, that was it for me, because, you
19  know, I'm thinking I'm going to cancel.  But after she
20  told me I couldn't, what else could I do?

21    Q    So you didn't write a letter to them saying
22  that you wished to cancel; is that correct?

23    A    No, because I was there in the office.  And
24  after I left and she told me I couldn't do it and I
25  knew Noel wasn't going to be home for another couple

56

1  of days, I felt like it was hopeless.  It was just --

2  I was stuck.

3      Q    So you didn't write them a letter; is that

4  correct?

5      A    Yes, ma'am.

6      Q    And you didn't -- you mean that you did not

7  write them a letter; is that correct?

8      A    Not that I can recall.

9      Q    And you didn't -- you didn't send them a

10  telegram?

11      A    Not that I recall.

12          You mean after I tried to cancel it?

13      Q    That's correct.

14      A    Not that I recall.

15      Q    So you never tried to cancel this in

16  writing; is that correct?

17      A    No, ma'am, not that I can recall.

18      Q    Okay.  If you'll look back at -- we're going

19  to look at Interrogatory No. 6.  And in that, I asked

20  you to set forth with specificity all facts which

21  support your claim that Washington Mutual violated the

22  Federal Truth in Lending Act.

23          And in that, you say, Washington Mutual

24  failed to meet the demands of the letter sent by

25  Washington Mutual -- sent to Washington Mutual --

61

1  closing about that?

2      A    Oh, yeah.  That was way after I found out

3  that there was a problem.

4      Q    Okay.  You called Johns & Johns --

5      A    That was specifically for this (indicating).

6      Q    Can I see that stack of documents if that's

7  the same ones?

8           MR. BAIRD:  The documents I gave you

9      today were the ones that were faxed to her

10     from Johns & Johns.  That's what she's been

11     talking about.

12          MS. DEMPSEY:  Oh, okay.

13  BY MS. DEMPSEY:

14     Q    So other than the ones that were faxed to

15  you later from Johns & Johns, these documents that

16  were in your file and that you've already produced to

17  me through your counsel --

18     A    Yes, ma'am.

19     Q    -- when did you get these?

20     A    At closing.

21     Q    And were you sent any of those documents

22  ahead of closing?

23     A    No, ma'am.

24     Q    Were you sent anything ahead of closing?

25     A    No, ma'am.

LYON  REPORTING,  INC.

62

1     Q     You didn't receive any documents from
2  Greatstone Mortgage ahead of closing?
3     A     No, ma'am.
4     Q     Did you receive anything that gave you an
5  estimate?
6     A     No, ma'am, because if I had have, then I
7  would have saw what the -- there was no way I would
8  have went.  I would have said, no, this is going
9  higher, not lower.  I never would have went.
10     Q     Now, you had to -- I'm assuming before you
11  went there on the day of your closing, you had to
12  provide Greatstone Mortgage with some documents; is
13  that correct?
14     A     Everything we did, we did on the phone.
15     Q     So you never mailed Greatstone Mortgage any
16  documents --
17     A     No, ma'am.
18     Q     -- or faxed them any documents?
19     A     Because the only thing I had for Heather was
20  that phone number.
21     Q     Now, if you look back to that Exhibit 2 --
22  and we're looking on page 10 there at the top.  And
23  your answer there says that your claims are based on
24  the fact that plaintiff demanded rescission of the
25  transaction within three days of the actual closing

64

```
 1                      EXAMINATION
 2   BY MR. BAIRD:
 3       Q    Ms. Douglas, I think that you testified that
 4   you did not send a letter to Foundation Funding Group
 5   or Greatstone asking to cancel the mortgage during the
 6   three days after closing; is that correct?
 7       A    Yes, sir.
 8       Q    All right.  But you did state that you went
 9   to the closing attorney's office --
10       A    Yes, because of the date.
11       Q    -- after the closing; is that correct?
12       A    Yes, sir, because of the date.
13       Q    And was that within three days after the
14   closing?
15       A    Yes, sir.
16       Q    And when you went to the closing attorney's
17   office on that date, did you have with you the
18   document that you have looked at earlier called the
19   notice of right to cancel?  I think I should refer
20   to --
21            MS. DEMPSEY:  Objection.  Leading.
22   BY MR. BAIRD:
23       Q    Did you have a document with you?
24       A    Yes, sir.  When I went back, I took the
25   whole contract and that document, because I thought
```

65

1   when I canceled it, I had to give everything back, you

2   know, so they could cancel it.

3       Q    Are you saying that you took all of the

4   documents back?

5       A    Yes, sir.

6       Q    Please look at Exhibit -- I guess it's

7   Defendant's Exhibit 1, and it's Bates labeled 0021.

8   And there are --

9       A    Yes, sir.

10      Q    -- similar documents labeled 0022.

11      A    Yes, sir.

12      Q    Well, those are the only two that I see,

13  0021 and 0022.

14           Did you take one of those documents with

15  you?

16      A    Yes, sir.  I took the two that had my name

17  on it (indicating).

18      Q    Did you testify that you asked that the date

19  be changed on that document?

20      A    Yes, sir.  I think she asked me that, and I

21  did --

22           MS. DEMPSEY:  Objection.  Leading.

23      Excuse me.

24  BY MR. BAIRD:

25      Q    Did you present that document --

66

1      A    Yes, sir.

2      Q    Did you have a conversation about that

3 document?

4      A    Yes, sir.  The young lady I talked to, I

5 told her I wanted to cancel the loan but I needed the

6 date changed because it would have reflected, if I had

7 signed it as it was, that I went past the time.  You

8 know, it wouldn't have been -- it wouldn't have looked

9 valid.

10          MR. BAIRD:  That's all I have.

11          MS. DEMPSEY:  And I just have one

12     follow-up question.

13                    REEXAMINATION

14 BY MS. DEMPSEY:

15     Q    Just leave that open so we don't have to go

16 back.

17     A    Yes, ma'am.

18     Q    Looking at WM 0021 in the middle, that

19 states, in the middle, if you could read along with

20 me, "If you decide to cancel this transaction, you may

21 do so by notifying us in writing at Foundation Funding

22 Group, Incorporated, 3627 West Waters Avenue, Suite

23 800, Tampa, Florida 33614.  You may use any written

24 statement that is signed and dated by you and states

25 your intention to cancel and/or you may use this

**EXHIBIT B**

 

 IndustryWatch

Aerospace/Defense
Auto
Aviation
Banking
- Commercial
- Credit Cards
- Credit Unions
- Develop Funding
- Electronic
- Foreign Exchange
- Regulations
Business and
Finance
Chemicals
Computers
Economy/Markets
Energy
Entertainment
Environment
Food
Government
Healthcare
Insurance
Internet
Metals & Minerals
Real Estate
Retail
Small Business
Telecommunications
Transportation
Travel
Utilities

searchIndustryWatch



## Former Manager of Tampa, Fla.-Based GreatStone Mortgage Takes Plea Deal

*Source: St. Petersburg Times*
*Publication date: 2004-04-09*
*Arrival time: 2004-04-11*

Apr  9—TAMPA, Fla. — The former manager of GreatStone Mortgage of Tampa has agreed to plead guilty to conspiracy to commit bank fraud and wire fraud and will cooperate with a continuing federal investigation of the defunct loan mill.

Federal authorities say William Jones conspired with other GreatStone executives, who face no criminal charges so far, to generate at least 930 bogus mortgage loans. The loans allegedly cost banks $68.5 million and cost the federal Department of Housing and Urban Development $9.5 million.

Former GreatStone employees say Jones ran a high-pressure telemarketing operation where loan officers paddled high-risk mortgages to homeowners across the country. Jones reportedly rallied his sales force with calls to act like "pirates and thieves."

Top salespeople at GreatStone were indoctrinated into an elite group at the mortgage company called the "Skulls," reporting directly to Jones. They hung black banners bearing a skull and crossbones from their desks.

GreatStone's troubles were first revealed by the St  Petersburg Times in late 2000 after company executives created a stir in the Hamlet, a Carrollwood subdivision.

The GreatStone executives cruised the Hamlet's quiet streets in a fleet of black luxury cars, offering top dollar for homes in the neighborhood

Corey Brower, the company's chief financial officer, announced an ambitious plan in February 2001 to turn the Hamlet into a GreatStone company retreat with a high security wall and a guarded entrance.

But within months of that announcement, federal housing authorities placed GreatStone on probation and accused the company of predatory lending practices.

The company, which once had 800 employees and did about $1-billion in mortgages a year, surrendered its Florida mortgage license in September 2001 rather than allow state banking authorities to audit its files.

In January 2002, the high-flying company that Brower started with his childhood friend Steven Cohn was permanently suspended from underwriting government-backed loans.

—ADVERTISEMENT—

4/18/2004 4:55 PM

The pl    greement Jones reached with federal official    ntends
he did not act alone in the conspiracy to defraud govern.   nt
agencies and banking institutions. His attorney, Tampa lawyer
Norman Cannella, said Jones will get a lighter sentence in
exchange for helping the government's investigation of GreatStone.

"Mr. Jones has agreed to cooperate with the government,"
Cannella said. "He does not possess any of the money the banks or
the government lost. He's broke."

Cannella said Jones, who is about 50 years old, no longer works
because of health problems. He lives in Tampa.

In addition to the conspiracy charges, Jones pleaded guilty to
making false statements to HUD.

He faces a sentence of as long as seven years in prison, up to
$500,000 in fines and up to four years of probation. Jones also
could be ordered to make restitution to any victims.

The joint investigation by the IRS, the FBI and HUD reveals an
elaborate scheme Jones participated in starting in late 1998 or
early 1999, when GreatStone began experiencing financial
difficulties.

The company obtained money by submitting loan documents to
banks for mortgages GreatStone had already funded with money
obtained from other banks

"The conspirators would change the date on a copy of the
promissory note and forge the signature of the mortgagee," the
agreement says. It became a "pyramid scheme" in which the
conspirators used money from fraudulent mortgages to repay
earlier loans fraudulently obtained.

Since the banks would wire loan money only to the title company
that had been chosen to handle the closing of the mortgaged
property, Jones and other GreatStone executives "created sham
title companies in various states throughout the nation."

The plea agreement says GreatStone executives also extended a
series of actual mortgage loans to non-qualified buyers or in
amounts in excess of FHA underwriting guidelines. They falsely
certified that the loans met FHA criteria for insurance.

"The conspirators concealed lines of credit they maintained with
several of the victim financial institutions" from auditors for the
Government National Mortgage Association, the plea papers say,
"in order to create the illusion that GreatStone was a financially
solvent entity."

----

To see more of the St. Petersburg Times -- including its homes,
jobs, cars and other classified listings -- or to subscribe to the
newspaper, go to http://www sptimes.com

(c) 2004, St. Petersburg Times, Fla. Distributed by Knight
Ridder/Tribune Business News.

Publication date: 2004-04-09

© 2004, YellowBrix, Inc.

**EXHIBIT C**

# TRUTH-IN-LENDING DISCLOSURE (REAL ESTATE)

Words, numbers or phrases preceded by a ☐ are applicable only if the ☐ is marked.
☐ Preliminary  ☒ Final

| | |
|---|---|
| LENDER (editor)<br>FOUNDATI    UNDING GROUP, INC.<br><br>1627 W. WATERS AVENUE, SUITE 600<br>TAMPA, FL 33614 | |

Borrower(s) Name(s):
**GWINELYNE DENISE DOUGLAS AND NOEL J. DOUGLAS**

Date: 8/26/00

Address: 408 ROSEWOOD CIRCLE
JONESBORO, GA, 30238
Property Address:
408 ROSEWOOD CIRCLE
JONESBORO, GA  30238

Loan No.: 6320859

Loan Type: FHA

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 9.176 % | $ 247,235.89 | $ 129,089.15 | $ 376,325.04 |

| | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | | WHEN PAYMENTS ARE DUE |
|---|---|---|---|---|
| YOUR PAYMENT SCHEDULE WILL BE: | 360 | 1,064.19  TO  1,008.41 | | MONTHLY, BEGINNING  10/01/00 |

**VARIABLE RATE:**
☐ This transaction is subject to a variable rate feature. Variable Rate disclosures have been provided at an earlier time.

**PAYABLE ON DEMAND:**
☐ This obligation is payable on demand.
☐ The disclosures are based on an assumed maturity of one year.

**SECURITY:**
You are giving a security interest in real property and any of the following items which are checked:
☐ the goods or property being purchased.   ☐ funds or other assets on deposit with the lender from time to time.
☒ other (specify below)   ☐ collateral securing other loans with us may also secure this loan.
408 ROSEWOOD CIRCLE
JONESBORO, GA  30238

**LATE CHARGE:**
If you are more than **FIFTEEN** days late in making any payment, you will pay a late charge of:   4.00   % of the principal and interest payment.

**INSURANCE:**
You may obtain property insurance from anyone acceptable to the Lender.

**FILING/RECORDING FEE:**
☒ $   50.00

**PREPAYMENT:**
If you payoff early, you
☐ may  ☒ will not   have to pay a penalty.
☒ may  ☐ will not   be entitled to a refund of part of the finance charge.

**ASSUMPTION:**
Someone buying your dwelling,
☐ cannot assume the remainder of the mortgage on the original terms.
☒ may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and creditor's policy regarding assumption of the obligation.

☐ Please refer to the "Good Faith Estimate" for an itemization of Amount Financed.   "e" means estimate.
☒ Please refer to the Itemization of Amount Financed Statement.

Borrower GWINELYNE DENISE DOUGLAS   26 Aug 00   Date   Borrower NOEL J. DOUGLAS   26 Aug 00   Date

Borrower _____ Date   Borrower _____ Date

Borrower _____ Date   Borrower _____ Date

**BORROWER(S) MUST DATE**

AAAKDG - 07192000   www.MortgageBankingSystems.com

WM 0106

# EXHIBIT D

## Gwindelyne and Noel Douglas Loan (#6320859)

FHA Fixed Rate (7.500% Note Rate)

Date Of Closing:        08/31/2000    First Payment Date: 10/01/2000 (per TILA disclosure
                                                                    and First Payment Notice)

Loan Term:              360 months   Amortization Term:  360 months

Insurance Type:              FHA    Payments Per Year:  12

### Payment Schedule

| Number of Payments | Principal and Interest | FHA Insurance Payment | Total Payment* |
|---:|---:|---:|---:|
| 12 | 1,005.82 | 58.37 | 1,064.19 |
| 12 | 1,005.82 | 57.82 | 1,063.64 |
| 12 | 1,005.82 | 57.21 | 1,063.03 |
| 12 | 1,005.82 | 56.56 | 1,062.38 |
| 12 | 1,005.82 | 55.86 | 1,061.68 |
| 12 | 1,005.82 | 55.11 | 1,060.93 |
| 12 | 1,005.82 | 54.29 | 1,060.11 |
| 12 | 1,005.82 | 53.42 | 1,059.24 |
| 12 | 1,005.82 | 52.48 | 1,058.30 |
| 12 | 1,005.82 | 51.46 | 1,057.28 |
| 12 | 1,005.82 | 50.36 | 1,056.18 |
| 12 | 1,005.82 | 49.18 | 1,055.00 |
| 12 | 1,005.82 | 47.91 | 1,053.73 |
| 12 | 1,005.82 | 46.54 | 1,052.36 |
| 12 | 1,005.82 | 45.06 | 1,050.88 |
| 12 | 1,005.82 | 43.46 | 1,049.28 |
| 12 | 1,005.82 | 41.75 | 1,047.57 |
| 12 | 1,005.82 | 39.90 | 1,045.72 |
| 12 | 1,005.82 | 37.90 | 1,043.72 |
| 12 | 1,005.82 | 35.75 | 1,041.57 |
| 12 | 1,005.82 | 33.44 | 1,039.26 |
| 12 | 1,005.82 | 30.94 | 1,036.76 |
| 12 | 1,005.82 | 28.25 | 1,034.07 |
| 12 | 1,005.82 | 25.36 | 1,031.18 |
| 12 | 1,005.82 | 22.23 | 1,028.05 |
| 12 | 1,005.82 | 18.87 | 1,024.69 |
| 12 | 1,005.82 | 15.24 | 1,021.06 |
| 12 | 1,005.82 | 11.34 | 1,017.16 |
| 12 | 1,005.82 | 7.12 | 1,012.94 |
| 11 | 1,005.82 | 2.59 | 1,008.41 |
| 1 | 998.85 | 2.59 | 1,001.44 |
| 360 | 362,088.23 | 14,229.24 | 376,317.47 |

\* These total payment figures represent the total payment consisting of principal and interest and mortgage insurance, as was required to be disclosed on the TILA. The borrower's actual monthly payment obligation included, in addition to these items, real estate taxes and hazard insurance payments.

WM 0188

# EXHIBIT E

# SECTION 32 MORTGAGE LOAN DISCLOSURE

LOAN ID# 6320859

Date: _____

Borrower Name 1:  GWINELYNE DENISE DOUGLAS _____

Borrower Name 2:  NOEL J. DOUGLAS _____

Borrower Name 3:  _____

Borrower Name 4:  _____

Borrower Name 5:  _____

Borrower Name 6:  _____

Property Address:  _408 ROSEWOOD CIRCLE_____

  JONESBORO, GA  30238_____

Closing Date:  _AUGUST  26TH,  2000____

YOU ARE NOT REQUIRED TO COMPLETE THIS AGREEMENT MERELY BECAUSE YOU HAVE RECEIVED THE DISCLOSURES OR HAVE SIGNED A LOAN APPLICATION.  IF YOU OBTAIN THIS LOAN, THE LENDER WILL HAVE A MORTGAGE ON YOUR HOME.  YOU COULD LOSE YOUR HOME AND ANY MONEY YOU HAVE PUT INTO IT IF YOU DO NOT MEET YOUR OBLIGATIONS UNDER THE LOAN (Regulation Z, Section 226.32(c)(1)).

1.  The Annual Percentage Rate of your loan is ____9.176_ %

2.  The amount of the monthly payment is $__1,005.82___.

3.  Your loan is a:

   (Check one)

   ☒ Fixed rate loan.

   OR

   ☐ Variable rate loan.  The interest rate and monthly payment on your variable rate loan may go up.  The highest

   monthly payment on your variable rate is $_____.

THERE ARE 2 DISCLOSURES FOR EACH BORROWER.  EACH BORROWER SHOULD SEPARATELY SIGN 2 DISCLOSURES.  PLEASE RETURN 1 ORIGINAL EXECUTED DISCLOSURE FOR EACH BORROWER UNDER THE LOAN IN THE ATTACHED ENVELOPE.  ONE ORIGINAL SHOULD BE RETAINED BY YOU FOR YOUR RECORDS.

I HEREBY CERTIFY THAT I HAVE RECEIVED THIS DISCLOSURE AT LEAST 3 BUSINESS DAYS PRIOR TO MY LOAN CLOSING.  I CERTIFY THAT I HAVE THE FINANCIAL ABILITY TO MAKE THE SCHEDULED PAYMENTS TO REPAY THIS LOAN OBLIGATION.

| AUGUST  26TH,  2000 | | |
|---|---|---|
| Date | GWINELYNE DENISE DOUGLAS | Borrower |
| AUGUST  26TH,  2000 | | |
| Date | NOEL J. DOUGLAS | Borrower |
| | | |
| Date | | Borrower |
| | | |
| Date | | Borrower |
| | | |
| Date | | Borrower |
| | | |
| Date | | Borrower |

I HEREBY CERTIFY THAT I MAILED THIS DISCLOSURE TO THE BORROWER, 5 OR MORE BUSINESS DAYS PRIOR TO THE LOAN CLOSING.

_____     _____

Name                                   Date

AANCQI · 10121995                    **WM 0020**                    Doc Prep Plus, Inc.

**EXHIBIT F**

LOAN ID # 6320859

# CERTIFICATE

### (That Customer Does Not Rescind Transaction)

The undersigned certify that they entered into a transaction on **AUGUST 26TH, 2000** with
*(Date)*

**FOUNDATION FUNDING GROUP, INC.**
*(Name of Lender)*

and they were given two copies of Notice of Right of Rescission and Notice of Effect of Rescission, as required under the provisions of Truth in Lending Act.

Whereas more than 3 business days have elapsed since the undersigned received the above and foregoing NOTICE OF RIGHT OF RESCISSION and other Truth-in-Lending Disclosures concerning this transaction; in order to induce the Creditor(s) to proceed with full performance under the agreement in question; the undersigned do herewith warrant, covenant and certify that they have not exercised their right to rescind; that they do not wish to and will not rescind said transaction; and that they do hereby ratify and confirm the same in all respects. They further represent that the undersigned are the only persons entitled to rescind, in that they are all of the owners of the real property securing said obligation.

NOTE: EACH Customer must sign.

| | |
|---|---|
| 31 | |
| AUGUST ~~XXXXX~~, 2000 | |
| Date | GWINELYNE DENISE DOUGLAS — -Borrower |
| 31 | |
| AUGUST ~~XXXXX~~, 2000 | |
| Date | NOEL J. DOUGLAS — -Borrower |
| Date | -Borrower |
| Date | -Borrower |
| Date | -Borrower |
| Date | -Borrower |



DEFENDANT'S
EXHIBIT
3 Douglas
2/24/04 KCC

GD 0020

Doc Prep Plus, Inc.

# EXHIBIT G



# Prime Time Transportation, Inc.

9003 Tara Blvd.
Jonesboro, GA 30236
Telephone (770) 477-1755  U. S. Toll Free  800-477-1765
Telefax (770) 471-5708

## Driver's Trip Record

| Date: 8/26/00 | Drivers Name: NOEL Douglas | Pay Miles (for office use only) |
|---|---|---|
| First Dispatch: Jonesboro GA   TO: Memphi's, TN. | | 317 |
| Second Dispatch: Lawrenceville  To: Jonesboro Ga | | 10 |
| Third Dispatch: 3 Stops | | 10    254.90 |
| Fourth Dispatch: | | 407 |
| Fifth Dispatch: | | 46 |
| Sixth Dispatch: | | 870 X 27 · 234.90 |
| Seventh Dispatch: | | 2 stops    20.00 |
| Eighth Dispatch: | | |

Tractor #: _146_    Trailer #(s): _K105-9803_ _____, _____

Delivery Appt°.: Day: ___MON___   Time: _ASAP_____
*If you cannot make your delivery appointment, you must call dispatch and advise ETA.
Comments:

Pick Up Info: 3 Stops

## MILEAGE SECTION

Enter Beginning Mileage Reading Here: [OLD 141]

| Date | State | Hwy. Traveled | Pick Up/Delivery City | State Line Reading | # of miles in state |
|---|---|---|---|---|---|
| 8/26 | GA | 20/78 | Jonesboro Ga | D40219 | |
| | AL | 20/78 | | | |

## CERTIFICATE OF SERVICE

I certify that on April 29, 2004, I served a copy of this document, by first class U.S. Mail with proper postage, upon counsel for Defendant Washington Mutual Bank, FA at the address shown below.[1]

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
Powell, Goldstein, Frazer &
Murphy LLP
Sixteenth Floor
191 Peachtree Street, N.E.
Atlanta, Georgia 30303

*Charles M. Baird*
Charles M. Baird

---

[1] Plaintiff has dismissed her claims against Defendant Foundation Funding Group, Inc.

# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 9 2004

LUTHER y. THOMAS, Clerk
By: 7. Finch Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GWINDELYNE DENISE DOUGLAS,       )
                                 )
        Plaintiff,               )    CIVIL ACTION
                                 )
v.                               )    NO. 1:03-CV-2538-CC
                                 )
FOUNDATION FUNDING GROUP, INC.,  )
and WASHINGTON MUTUAL BANK, FA,  )
                                 )
        Defendants.              )

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

In support of Plaintiff's Motion for Partial Summary
Judgment, filed on April 29, 2004, Plaintiff submits the
following statement of material facts as to which Plaintiff
contends there is no genuine issue to be tried.

1.   At all times relevant hereto, Defendant Foundation
Funding Group, Inc. ("FFG"), in the ordinary course of its
business, regularly extended consumer credit for which a finance
charge was imposed. (Am. Compl. ¶ 6.)

2.   On August 31, 2000, Plaintiff entered into a mortgage
loan transaction ("Transaction") with FFG. (Deposition of
Gwindelyne Denise Douglas ("Douglas Deposition") at 41:18-20;
43:11-15; 52:10-53:10.; Declaration of Gwindelyne Denise Douglas
("Douglas Declaration") ¶ 2.)

3.   True copies of the Note, Security Deed, and documents

used to make disclosures under the Truth in Lending Act ("TILA") are attached as exhibits to the transcript of the Douglas Deposition. (Douglas Dep., Ex. A.)

4.   Plaintiff entered into the Transaction for personal and household purposes, i.e., to refinance an existing residential mortgage, rather than for any business reason. (Douglas Decl. ¶ 3.)

5.   In connection with the Transaction, FFG acquired or retained a security interest in Plaintiff's principal dwelling, which Plaintiff already owned prior to the Transaction. (Douglas Decl. ¶ 4.)

6.   In the Transaction Plaintiff incurred an obligation that included a finance charge and was initially payable to FFG. (Am. Compl. ¶ 7; Washington Mutual Bank, FA's Answer to Pl.'s Am. Compl. ("WaMU Answer") ¶ 7.)

7.   The total points and fees payable in connection with the Transaction make it a mortgage of the type referred to in 15 U.S.C. §1602(aa). (Am. Compl. ¶ 9; WaMu Answer ¶ 9.)

8.   Plaintiff received no documents concerning the Transaction before the day of the closing.(Douglas Dep. at 61:24-62:20.)

9.   Plaintiff did not sign any documents concerning the Transaction before the day of the closing. (Douglas Dep. at

-2-

49:12; 61:24-62:20.)

10.   All of the documents concerning the Transaction that Plaintiff signed, she signed on the day of the closing. (Douglas Dep. at 49:12.)

11.   Plaintiff's co-borrower, Noel Douglas, was out of town and was unable to attend the closing of the Transaction on the originally scheduled date of August 26, 2000; for this reason, the date was changed to August 31, 2000. (Douglas Dep. at 41:15-20; 43:11-15; 52:10-53:10; Sec. Douglas Decl. ¶¶ 4-7.)

12.   In connection with the Transaction, Plaintiff was required to pay for mortgage guaranty insurance. (Washington Mutual Bank's Br. in Supp. of Mot. for Summ. J. ("WaMu Summary Judgment Brief"), Ex. E.)

13.   The "amount of the monthly payment" shown on the Section 32 Mortgage Loan Disclosure used in the Transaction consisted only of principal and interest; no mortgage insurance premium was included. (Douglas Dep., Ex. 1 (doc. WM 0020); WaMu Summ. J. Br., Ex. E.)

14.   On the Section 32 Mortgage Loan Disclosure used in the Transaction the certification of mailing at the bottom of the document was not signed. (Douglas Dep., Ex. 1 (doc. WM 0020); WaMu Summ. J. Br., Ex. E.)

15.   The true amount of the final payment in the Transaction

-3-

is $1001.44. (WaMu Summ. J. Br., Ex E.)

16. The true total of payments in the Transaction is $376,317.47. (WaMu Summ. J. Br., Ex E.)

17. FFG assigned its interest in the Transaction to Bank United of Texas, FSB ("Bank United"). (Am. Compl. ¶ 11; WaMu Answer ¶ 11.)

18. Bank United was merged into Washington Mutual on February 13, 2001. (Am. Compl. ¶ 12; WaMu Answer ¶ 12.)

19. At the time of its assignment, the fact that the Transaction was a mortgage referred to in 15 U.S.C. § 1602(aa) was determinable from the documentation required by TILA, the itemization of amount financed, and other disclosure of disbursements. (Douglas Dep., Ex. 1.)

20. The rescission letters attached as Exhibits C and D to the Douglas Declaration were mailed to Defendant on August 25, 2003. (Am. Compl. ¶ 18; Douglas Decl. ¶ 5.)

21. Defendant  Washington Mutual Bank, FA ("Washington Mutual") received the above letters, but did not, during the twenty-day period thereafter, meet the demands made in the letters. (Am. Compl. ¶ 21.)

<u>LOCAL RULE 7.1D CERTIFICATION</u>

The undersigned certifies that this document was prepared in Courier New (12 point) font, one of the font and point selections

approved by Local Rule 5.1B.

Respectfully submitted,

*Charles M. Baird*

Charles M. Baird
Georgia Bar No. 032500

Attorney at Law
235 Peachtree Street, Suite 400
Atlanta, Georgia 30303-1400
(404) 287-2383
Mobile:(404) 522-9485
Fax: (404) 627-6049                    Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on April 29, 2004, I served a copy of this document, by first class U.S. Mail with proper postage, upon counsel for Defendant Washington Mutual Bank, FA at the address shown below.[1]

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
Powell, Goldstein, Frazer &
Murphy LLP
Sixteenth Floor
191 Peachtree Street, N.E.
Atlanta, Georgia 30303

*Charles M. Baird*

Charles M. Baird

---

[1] Plaintiff has dismissed her claims against Defendant Foundation Funding Group, Inc.

-5-